SALCINES, Judge.
Jane Zentek and James B. Paternostro, the defendants at trial, appeal the final judg *1082 ment entered in favor of the plaintiff, Better Business Brokers & Consultants, Inc., pursuant to an order setting aside a jury’s verdict. Because the trial court erred in setting aside the jury’s verdict, we reverse.
The original action in this case was filed by Better Business against Norman Brewer in 1992, for breach of contract as a result of a real estate commission Better Business claimed Brewer owed for fees in procuring a purchaser for Brewer’s property., In August 1994, Better Business amended its complaint and joined Jane Zentek and James Paternos-tro as parties defendant, alleging that they were the purchasers of the property and had tortiously interfered with the business relationship between Brewer and Better Business. Subsequently, Brewer and Better Business entered into a settlement agreement, and Brewer was dismissed as a party to the action.
The matter ultimately went to trial in June 1997. At the close of the evidence, Better Business filed a motion for a directed verdict which was denied. The jury rendered a verdict in favor of the defendants. The trial judge expressed certain reservations about whether the jurors understood that the plaintiff was Better Business and that the defendants were Paternostro and Zentek, and conducted some questioning in that regard. The jurors correctly and unequivocally identified the defendants and the plaintiffs. Subsequently, Better Business filed a motion to set aside the verdict pursuant to Florida Rule of Civil Procedure 1.480, which the trial court granted, and which is the subject of this appeal.
In reviewing the trial court’s order directing a verdict in favor of Better Business, this court must view the evidence and all inferences of fact in a light most favorable to the nonmovants, Zentek and Paternostro. See Orsi v. All American Termite & Pest Control, Inc., 700 So.2d 425 (Fla. 2d DCA 1997). The directed verdict in favor of Better Business can be affirmed only if there was no evidence upon which the jury could properly have relied to support its verdict in favor of Zentek and Paternostro. See Collins v. School Bd. of Broward County, 471 So.2d 560 (Fla. 4th DCA 1985). Hence, we turn first to the factual backdrop which set the stage for the legal entanglements in which these parties now find themselves.
On June 11, 1991, Norman Brewer signed an exclusive listing agreement with Better Business for the sale of his business, known as Korman Muffler, together with the real property on which it was located in Winter Haven, Florida. The listing agreement provided that the seller would pay a commission, to Better Business if the property sold or otherwise transferred during a six-month period which would run through December 11, 1991, or if it were sold within a year after the expiration of the listing agreement to anyone who had been made aware of the availability of the property for purchase through Better Business’s agents.
During the summer of 1991, a real estate agent from Better Business contacted James Paternostro as a potential buyer of the property and took Paternostro to the site. En route to the site, Paternostro advised the agent that he was aware of the property and had looked at it and discussed its purchase on prior occasions. Other individuals testified, at the trial, that they had made Pater-nostro aware of the availability of the property as far back as 1985 or 1986.
Paternostro, nonetheless, accompanied the agent to the site and executed an offer to buy the property for $160,000.00. The seller, Brewer, initially rejected the offer, but on July 15, 1991, signaled his willingness to reconsider and accept Paternostro’s offer. A proposed closing date of August 27, 1991, was set. The contract was contingent upon Paternostro’s obtaining financing for the purchase.
Paternostro applied for the necessary financing and, on August 9, 1991, received a loan commitment from a bank. The bank provided that the commitment would be good for sixty days. The commitment was contingent, however, upon an appraisal of the property at a sufficiently high value and upon the property passing a specific environmental audit known as a “Phase I” audit. Paternostro and Brewer agreed between themselves that Brewer would pay for the environmental audit, and upon satisfactory conclusion of that *1083 environmental audit, Paternostro would order the appraisal.
In September 1991, an agent for Better Business contacted both Paternostro and the bank, and orally advised them that the environmental audit had been completed and that the property was clean. This information was ultimately determined to be incorrect. The bank proceeded to order the appraisal, and the property appraised at approximately its purchase price. However, the bank required a written report of the environmental audit to continue processing the loan. The written report indicated that the property had not passed the environmental audit and recommended that additional testing be conducted in another environmental audit known as a “Phase II” audit.
Upon learning of the unfavorable results of the environmental audit, Paternostro called Better Business to request a refund of the $1,500.00 appraisal fee he was obligated to pay. Paternostro maintained that the appraisal had been ordered in reliance upon the verbal misinformation provided by Better Business that the environmental audit had shown the property to be clean. Paternostro spoke first to the agent who had relayed the incorrect information, and then directly to the owner of Better Business, Mary Lou Hirsch. Paternostro informed Ms. Hirsch of the misinformation provided by one of her agents and repeated his request for a $1,500.00 reimbursement. Ms. Hirsch refused.
Paternostro then offered to purchase the real property for up to twelve months longer provided Better Business would reimburse the appraisal fee to him, and that the property would ultimately pass the Phase II audit required by the lender. Paternostro agreed that if the property was ultimately determined to be clean, he would purchase the property as originally contemplated and would refund the $1,500.00 appraisal as part of the closing costs. Ms. Hirsch of Better Business refused. Thus, as of September 22, 1991, Paternostro determined the deal to be dead. Ms. Hirsch also testified that it was dead after that telephone call. She never contacted Paternostro again. Finally, as a result of the unsatisfactory conclusion of the environmental audit, the bank withheld the financing for closing, and in early October, 1991, the loan commitment from the bank expired.
The cause of the environmental concern was the proximity of a nearby, gasoline station. Brewer, the seller, obtained the cooperation of the station’s owner, and had additional environmental tests performed. Ultimately, in December 1991, the environmental study was completed showing that the leaking gasoline tank’s plume was flowing away from Brewer’s property. Upon receipt of the satisfactory environmental report, Brewer contacted Paternostro again regarding the purchase of his property and was advised that Paternostro was not interested. Brewer suggested, however, that he and Paternostro meet with Brewer’s attorney. About December 20, 1991, Paternos-tro met with Brewer and his attorney. The meeting ended with the conclusion that Paternostro could not and would not purchase the property.
Around this time, Terry Lane, a business associate, suggested to Zentek, Paternostro’s fiancee, that she consider acquiring the property for investment purposes. Following this recommendation, Zentek subsequently organized a corporation, Double J, Inc., which then acquired the property from Brewer on February 20, 1992. Double J entered into a long-term lease with Paternostro. The lease was to provide funds with which to pay the mortgage and, after the first twenty-four months, was to provide an additional $1,000.00 per month income to Double J for the life of the lease. The lease was to survive the mortgage by six years. Paternostro was granted an option to purchase the property upon the termination of the lease.
At the trial, Better Business theorized that Double J was a mere subterfuge to circumvent the payment of its commission. Indeed* there was strong support for this argument. Nonetheless, Zentek testified that she had thought about buying a piece of investment property for some time and had been aware of the Brewer property long before Better Business listed the property. She also explained that she had wanted to limit her personal liability, so she decided to acquire the Brewer property through a corporate entity. Zentek categorically denied that Pa- *1084 ternostro had controlled the deal to acquire the property. Zentek was the sole shareholder and officer of Double J, and Double J conducted itself as an ongoing corporate entity following all required corporate formalities. The trial judge even agreed to give the jury an instruction regarding its power to find the corporation to be the alter ego of the sole shareholder.
In granting the motion pursuant to Florida Rule of Civil Procedure 1.480, the trial court found that there was no evidence which would have supported the verdict and, thus, as a matter of law Better Business should have prevailed. Contrary to the trial court’s finding, however, there was evidence that Zentek and Paternostro were not the purchasers of the property and instead that Double J purchased the property. There was evidence that Double J operated as an ongoing corporate entity, that neither Double J nor Zentek became aware of the property through Better Business, and that Paternos-tro was not a shareholder, officer or director of Double J. While there was conflicting evidence regarding the intent behind the formation of Double J, for the purpose of reviewing the order granting a directed verdict, those conflicts must be resolved in favor of Zentek and Paternostro. See Collins, 471 So.2d 560.
This matter is reversed and remanded for the entry of a final judgment in favor of the defendants, Zentek and Paternostro.
NORTHCUTT, A.C.J., and QUINCE, PEGGY A., Associate Judge, Concur.